UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMBER L. PRICE, ) | Civil Action No. __23-752__ |
| Plaintiff, ) | |
| v. ) | Judge_____ |
| FRAZER TOWNSHIP, PENNSYLVANIA, ) | |
| Defendant. ) | **Electronic Filing** |
| ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

### I. NATURE OF THE ACTION

1.      This is a civil action to correct unlawful discriminatory employment practices, and to make whole the Plaintiff, Amber L. Price ("Plaintiff," or "Officer Price"). Following an investigation, the United States Equal Employment Opportunity Commission ("EEOC") concluded Defendant Frazer Township ("Defendant" or "Frazer"), by and through its Chief of Police, Terrence "Terry" Kuhns ("Chief Kuhns" or "the Chief"), unlawfully terminated Officer Price and denied her the opportunity to resign in lieu of termination, because of her sex.

### II.  PARTIES

2.      Plaintiff, Amber L. Price, is an adult resident of Allegheny County, Pennsylvania.

1

3.      Defendant Frazer Township, Pennsylvania is a political subdivision of the Commonwealth of Pennsylvania and a Second Class Township pursuant to the Pennsylvania Second Class Township Code, 53 Pa. Stat. § 65101 et seq., having offices at 592 Pittsburgh Mills Circle, Tarentum, Allegheny County PA 15084.

4.      At all times relevant to the claims asserted herein, Frazer has employed fifteen or more employees.

5.      At all times relevant to the claims asserted herein, Frazer has continuously been a person, covered entity, and an employer within the meaning of 42 U.S.C. § 2000e and 43 P.S. § 954(a) and (b).

6.      At all times relevant to the claims asserted herein, Frazer has been a recipient of federal funds.

## III. JURISDICTION AND VENUE

7.      Original federal question jurisdiction over this private suit to enforce civil rights under federal law, is conferred on this court by 28 U.S.C. §1331.  Supplemental jurisdiction over the related state statutory claims is conferred by 28 U.S.C. § 1367(a).

8.      Venue is properly laid in the U.S. District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(b), and in the Pittsburgh Division, pursuant to W.D.PA. L.R. 3.1.,

because the unlawful employment practices occurred in and around Allegheny County, Pennsylvania, where Officer Price worked, where Defendant is located, and where she suffered the unlawful employment practices and the resultant damages.

## IV. CLAIMS

9.      Officer Price is an experienced law enforcement officer, having served municipalities in Pennsylvania as a full-time and part-time police officer beginning in 2001, after graduating from the police academy in 2000.

10.      Officer Price was hired by Frazer Township as a Patrol Officer on February 1, 2016, and terminated by Chief Kuhns on May 23, 2018; Officer Price filed a claim for unemployment compensation (UC) benefits where Chief Kuhns and she testified under oath at a UC hearing about the circumstances surrounding her termination.

11.      Officer Price was hired as a "Part-time" police officer, but she routinely worked for Frazer in excess of thirty-two hours per week, and sometimes worked for over forty hours per week.

12.      The Frazer police department was and is overwhelmingly male; with the exception of Officer Price, none of the female police officers Frazer hired have remained employed by Frazer for more than one year. Officer Price is the only female police officer Frazer ever hired who had over ten years' experience.

3

13.     Frazer employs both full-time and part-time police officers; only full-time police officers receive health insurance and related benefits.

14.     Frazer has never employed a female full-time police officer.

15.     At no time during her employment with Frazer before she was terminated, was Officer Price ever disciplined by Frazer, or Chief Kuhns either for her performance or for her conduct.

16.     As of May, 2018, Officer Price was the most senior female police officer employed by the Frazer Police Department.

17.     Frazer has a practice of hiring or promoting its police officers from part-time to full-time based on seniority.

18.     In December 2017, the only full-time police officer other than the Chief resigned.

19.     Over the ensuing months, the part time male Patrol Officers often talked and argued about which one of them would or should be made the next full-time police officer, based on who deserved it more.

20.     Frazer Officer Dalton VanWhy ("Officer VanWhy"), who was immediately after Officer Price in seniority, repeatedly told Officer Price that Frazer would never hire "a girl" as a full time police officer.

21.     In the course of conducting official police work, Frazer police officers are required to use secure, restricted-use law enforcement databases administered by the Justice Network ("JNET"), an office of the Pennsylvania Office of Administration, such as the Commonwealth Law Enforcement Network ("CLEAN") to access various Criminal Justice Information ("CJI") such as drivers and professional licenses, and criminal histories.

22.     The JNET Misuse policy guide provides, in pertinent part, "JNET highly recommends that all agencies assign a local Sponsor and Registrar to handle the [sic] own JNET user maintenance and to properly enforcement JNET's policies." This role is referred to as the JNET Terminal Agency Coordinator, or "JTAC officer."

23.     Full time officer Sergeant Brian Pazak had served as the JTAC Officer; when he resigned from the Frazer police department in December 2017, Officer Price took over the uncompensated additional duty as the JTAC Officer.

24.     On April 5, 2018, the Pennsylvania State Police ("PSP") suspended Officer VanWhy from JNET Systems, including CLEAN access and Allegheny County 911 access ("ACES"), for misuse and the same day he was suspended from working at neighboring Springdale Borough since he was incapable of performing his duties as a police officer; he was prohibited from calling into Allegheny County 911 and denied all computer access to any confidential information which permits police officers to complete an arrest or write a citation.

25.     This was the initial suspension pending a further investigation by PSP; the investigation concluded Officer VanWhy had engaged in repeated misuse, and he was suspended from CLEAN for a total of 6 months.

26.     In violation of JNET Misuse policy, Chief Kuhns ordered the other Frazer police officers, including Officer Price, to provide Officer VanWhy with CJI data from these systems during his suspension.

27.     During Officer VanWhy's suspension from JNET, he filed more than forty (40) criminal cases and traffic citations as the arresting officer, including on April 18, 2018 (Docket Number: MJ-05303-CR-0000192-2018), at a time when he was not entitled to access the criminal history or personal information of the individuals he arrested or issued traffic citations to.

28.     Officer Price, as the JTAC Officer, was charged with enforcing JNET policy, and told Chief Kuhns she would not participate in violating JNET rules by providing Officer VanWhy with CJI which he was not authorized to access or use.

29.     As a result of Officer Price's refusal to engage in misuse of JNET, Chief Kuhns could not assign Officer Price to work on the same shifts with Officer Van Why.

30.     On May 18, 2018, Officer VanWhy resigned from Springdale Borough under threat of termination due to his misuse of JNET/CLEAN.

31.     As of May 22, 2018, other than Officer Aaron Scott ("Officer Scott"), Officer Price was Frazer's then-longest-serving police officer, and there were no officers above the rank of Patrol Officer other than Chief Kuhns.

32.     It was known to Chief Kuhns and the other Frazer police officers that Officer Scott was resigning, and his last day was to be May 24, 2018.

33.     On May 22, 2018, Officer Price arrived at the Frazer Police Department ("station") at 2:50 p.m. for her 3:00 shift.

34.     On May 22, 2018, part-time Officer Matthew Miller ("Officer Miller") worked the same 3:00-11:00 p.m. shift with Officer Price.  Officer Price left the police station before Officer Miller and initially each officer drove a separate vehicle.

35.     On May 22, 2018, before Officer Price left the police station for her 3:00 shift, Chief Kuhns told her that Victoria's Secret had been calling mall security and not calling 911 to report retail thefts. Officer Price told him she would call the Regional Manager to clarify the store's policy and see why they were not calling 911.  Chief Kuhns said OK. Officer Price put on her belt and vest and left the station.

36.     Because the Frazer police station is located in the Pittsburgh Mills Mall, many of the mall store managers called Frazer police officers, including Chief Kuhns, directly on their private cell

phones if they knew which officer was working, rather than calling Allegheny County 911 for the report to be dispatched back to Frazer by radio, which saves about 5 minutes of response time.

37.     Officer Price had arranged to meet the Walmart Asset Protection ("A.P.") Manager, Kathy, between 3:00-3:15 p.m. that day to collect video evidence of some recent thefts, and so Officer Price went straight to Walmart from the station.

38.     Officer Price had already left the Frazer police station no later than 3:07 p.m., at which time her telephone records prove she called her husband.

39.     Around 3:16 p.m. while Officer Price was inside the loss prevention office with the A.P Manager Kathy reviewing video, there was another retail theft in progress at Walmart, which Officer Price immediately investigated and gathered all pertinent information related to that theft. Officer Price then proceeded to secure the video evidence for the prior theft investigations, as originally planned.

40.     Officer Price returned to the police station with the video evidence and her dinner in a Walmart bag. She fed the fish in the station and used the restroom and sat down to begin reviewing video evidence.

41.     At 5:09 p.m. on May 22, 2018, she heard Officer Miller on the radio asking for license plates checks to be run for him, and she realized the computer in his police cruiser had not been repaired. She texted him and told him to meet her at the station so he could use the computer in

her vehicle to run his license plate checks. He said he was at the gas station and would come to the police station.

42.     Around 5:21 p.m., both Officers Miller and Price were at the police station when Officer Price received a call on her cell phone from Walmart A.P Manager Kathy reporting another theft, and at about the same time, Officer Miller received a call from Chief Kuhns; Officer Price would later learn J.C. Penney had just called the Chief to report a theft.

43.     Both officers got in Officer Price's vehicle, and she began driving towards Walmart. Officer Miller asked where she was going and she told him she was going to Walmart, as that was where she had received the call from. Only then did Officer Miller first inform her that the call he had received from the Chief was about a reported theft at J.C. Penney. Officer Price dropped Officer Miller off at J.C. Penney and went to Walmart.

44.     At no time did Officer Miller ever say anything to Officer Price about Chief Kuhns having given him or them an order to be present inside the J.C. Penney store during any period of time during their shift; Office Miller only told Officer Price that Chief Kuhns told him he had just received a call to report a theft in progress at J.C. Penney.

45.     The officers investigated the two thefts and otherwise completed their shifts without incident; Officer Price entered partial written reports for the two thefts at Walmart, and indicated in her reports that she would complete them the following day.

46.     Chief Kuhns did not contact Officer Price by telephone or text message at any time during her shift on May 22, 2018 or at any time thereafter, until she arrived for her shift at 2:50 p.m. on May 23, 2018.

47.     According to Chief Kuhns, he left the Frazer Police Department around 3:20 on May 22, 2018, and went to Penn Township for the evening to bottle wine with a friend; photos from that night of a visibly intoxicated Chief Kuhns and Officer Scott were posted to Facebook.

48.     Chief Kuhns sent several late-night text messages to the Walmart A.P Manager Kathy's personal phone on May 22, 2018, beginning at 10:56 p.m., admonishing her not to choose which officer to report cases to.

49.     At all times relevant to the claims asserted herein, Officer Price had observed, and it was common knowledge on the Frazer police force, on the Frazer Board of Supervisors, in Frazer Township, and among the police forces in the Allegheny Valley that Chief Kuhns often failed to work his scheduled shifts without notice, arrived to work his shifts intoxicated, drank alcohol during his shifts, and appeared to suffer from active alcoholism.

50.     On May 23, 2018, Officer Price arrived for her 3:00 shift at 2:50. Several off-duty Frazer police officers were standing outside the police station, and they laughed at her as she entered.

51.     Chief Kuhns called her into his office and closed the door. He was not in uniform, disheveled, agitated, and smelled of alcohol.

10

52.     Chief Kuhns asked Officer Price, "Why were you not at J. C. Penney's yesterday at 5?" Officer Price asked, "Why would I be at J.C. Penney's at 5?" He replied, "Why were you not at J.C. Penney's when I gave you a direct order to be there at 5?"

53.     Chief Kuhns started to raise his voice and slam his hand on the table and said "Where were you? Don't lie to me because I checked the GPS and I know where you were at." Office Price said, "I was at the station, and then I went to Walmart for a retail theft."

54.     Kuhns became very irate and started yelling that Officer Price had disregarded a direct order to go to J.C. Penney's at 5 pm.  Officer Price told him that she had no idea what he was talking about. Chief Kuhns then raised his voice further and started yelling very loudly that Officer Price was lying. Officer Price continued to attempt to tell him several times that she had no knowledge of such a direct order, and asked him when he had given it. Chief Kuhns replied, "I told you both to be there yesterday."

55.     Officer Price repeated she had gone to a call for a retail theft at Walmart. Chief Kuhns began to argue there had been no theft at Walmart because, he said, Kathy had not called 911.

56.     Officer Price replied that Kathy had notified her on her personal cell phone, and attempted to explain that she had started to enter the report in the police reporting system yesterday and that she was going to finish the report that day.

57.     Chief Kuhns would not let Officer Price explain, but just kept yelling at her, "I know you ignored a direct order, and you are fired." He said she didn't follow his orders and he was sick of her doing what she wanted. He said he had made up his mind, and, "You are terminated because you disobeyed a direct order."

58.     Officer Price just sat there still trying to explain that there was no direct order and Chief Kuhns yelled, "I am done, get the fuck of my police station." Officer Price continued to sit there, and she began crying.

59.     Chief Kuhns told her she could clean out her lockers that day or she could make arrangements to get her property later. Officer Price told him she would collect her property at that time.

60.     As Officer Price stood up to leave his office, Chief Kuhns said, "Maybe down the road in a couple of months we can revisit this, and if you want to come back to work, we can discuss it, but I just need a break right now."

61.     At no time did Chief Kuhns inform Officer Price that he was considering any disciplinary action against her of any kind, until he told her she was terminated.

62.     Officer Price was not provided a Loudermill pre-termination notice or hearing.[1]

---

[1] Plaintiff does not assert a separate claim for the violation of her Constitutional due

63.     At no time on May 22, 2018 did Chief Kuhns order Officer Price to be present in J.C. Penney at any specific time or during any range of time during her shift that day, and Officer Price never observed Chief Kuhns giving such an order to Officer Miller.

64.     Officer Price left the Chief's office and went and cleaned out her lockers.

65.     When Officer Price left Chief Kuhns' office, all the male officers present, Officers Aaron Scott, Dalton VanWhy, Dan Rote, and Lee Bartolicious made derogatory, mocking comments to Officer Price, for example, "Aww poor Amber!"

66.     Other than Officer Scott, the other male officers were all in plain clothes, and they were not even scheduled to work.

67.     The off-duty police officers were all there only because they had been informed earlier by Chief Kuhns and Officer Aaron Scott that Chief Kuhns was firing Officer Price when she arrived for her afternoon shift, so they came in to observe the firing.

68.     They were laughing and taking pictures of Officer Price cleaning out her locker. Chief Kuhns stood there and laughed along with them. Officer Price was embarrassed and humiliated.

---

process rights under the 14th Amendment, however, the violation of her property and liberty rights is additional evidence of the timely discrimination claims.

69.     The off-duty officers followed Officer Price outside and watched the contents of her locker fall out of the broken plastic bag, and then they stood outside of the police department laughing, saying "Fucking bitch, good for you!" and, "The bitch is finally gone!" telling her to go home and not to come back.

70.     Officer Price was upset and began crying.

71.     Chief Kuhns stood nearby smoking and watching and did nothing to intercede.

72.     Chief Kuhns subsequently asserted he terminated Officer Price for failing to follow a direct order.

73.     Chief Kuhns did not offer Officer Price the opportunity to resign instead of being fired, which would have greatly improved her future employment opportunities as a police officer.

74.     Chief Kuhns has offered every male officer who he was going to fire for cause the opportunity to resign in lieu of termination.

75.     Chief Kuhns subsequently claimed, under oath, that at approximately 3:20-3:25 p.m. on May 22, 2018, both officers Price and Miller were seated in the station, and he gave both officers the same order to be visibly on patrol inside the J.C. Penney store between 5:00 and 6:00 p.m. In Frazer's later response to the EEOC, Frazer claimed the order was to be there between 5:00 and 6:30 p.m.

76.     Chief Kuhns did not terminate the male officer, Officer Miller, who Chief Kuhns later claimed had also received the same direct order and disobeyed it.

77.     Chief Kuhns reported that he asked Officer Miller why he had not gone to J.C. Penney at 5:00 on May 22, 2018, and Officer Miller replied that he had forgotten the Chief's order.

78.     Following her termination, Officer Price diligently looked for work as a police officer and applied for positions with other police departments.

79.     When Officer Price had been offered positions as a police officer, Chief Kuhns was contacted for a reference, and as a result, the offers were withdrawn.

80.     As of May 23, 2018, part time male Officer Aaron Scott ("Officer Scott") had resigned from Frazer effective May 24, 2018, to work for the Cheltenham Township, Pennsylvania police department.

81.     Upon Officer Scott's departure, Officer Price would have become the most senior officer in the Frazer police department. At that time, there was a full time police officer vacancy due to the prior Sergeant having left the department in December 2017.

82.     Officer Scott, like many of the male police officers employed by Frazer, routinely made statements generally denigrating women and specifically denigrating female police officers.

83.    Officer Scott made false derogatory comments about Officer Price to Chief Kuhns.

84.    Upon information and belief, Officer Scott did not successfully complete his probationary period and was fired by the Cheltenham Township Police Department after a few months.

85.    In Fall of 2018, Chief Kuhns rehired Officer Scott as a full-time officer and promoted him to Sergeant.

86.    On March 25, 2018, male part-time Frazer police officer Dalton VanWhy ("Officer VanWhy") had failed to enter a police report or inform the next shift about a DUI arrest on his shift.

87.    Officer Price and a male officer, Officer Zembrowski, relieved Officer VanWhy, and Officer Price received a call from the suspect's mother about the incident. Neither Officer Price nor Officer Zembrowski had any knowledge that Officer VanWhy had an actor in custody on the previous shift.

88.    When Officer VanWhy returned to the Frazer police station during Officer Price's shift, he was acting very annoyed and threw things around the office. Officer Price informed him of the mother's call and asked why there was no report of the incident in the system. Officer VanWhy responded, "Tell his mother to go fuck herself he is an adult."

89.     Officer Price explained that he should have entered a report in the system or advised her or her fellow officer Zembrowski of the incident at the shift change. Officer VanWhy replied, "Fuck yourself Woman!" Officer Price replied, "Next time complete your reports." He screamed back, "Fucking Bitch." Officer Price immediately called and reported this to Chief Kuhns, who directed her not to talk to Officer VanWhy until he had a chance to deal with it the following day.

90.     Chief Kuhns never spoke to Officer Price about Officer VanWhy's misconduct, no discipline was imposed on Officer VanWhy for it, and he continued to work for the Frazer police department.

91.     Officer VanWhy was subsequently found to have misused the CLEAN and JNET law enforcement databases for personal use.  He was found to have disseminated information from the database, like Social Security numbers, and license plate information to non-certified recipients. VanWhy's access to these databases was suspended by the Pennsylvania State Police for months.

92.     Without access to the law enforcement databases, Officer VanWhy could not perform all of the duties of a police officer, and therefore could not work a shift alone. As a result, Chief Kuhns required the Township to pay another officer to be on duty with him at all times.

93.     Officer VanWhy was not allowed to access the 911 center or database terminals to query or perform his duties as a police officer, but Chief Kuhns disregarded the findings of the Pennsylvania State Police and kept him employed and actively working during his suspension.

94.    Chief Kuhns directed the officer on duty with Officer VanWhy to provide Officer VanWhy with protected information from the databases, which VanWhy was no longer legally permitted to have.

95.    Officer VanWhy was also found to have sent nude pictures of himself to multiple female employees at the local Walmart, in the mall where the Frazer police department is located.

96.    Chief Kuhns was well aware of all of Officer VanWhy's transgressions, but the male Officer VanWhy was not disciplined or fired; Frazer continued to employ him for years thereafter.

97.    Male part time Frazer police officer Lee Bartolicious ("Officer Bartolicious") was found by Chief Kuhns to have engaged in sexual relations with a confidential informant in a local hotel while on duty.

98.    Officer Bartolicious told Officer Price that despite this malfeasance, he was not fired, and that Chief Kuhns had given him a second chance.

99.    In 2016, Officer Bartolicious was to be fired for cause by Frazer, but he was given the opportunity to resign, which he did.

100. Chief Kuhns rehired Officer Bartolicious in 2017.

101.    Male part time Frazer police officer Chris Nablo was found to have stolen from his fellow police officer in the Frazer police station, and though he initially lied and denied it, he subsequently admitted it.

102.    Chief Kuhns set up a sting operation in the police station where Officer Nablo was caught stealing gun parts. As a result, Chief Kuhns gave Officer Nablo the option to resign instead of firing him, and so Officer Nablo also resigned without any disciplinary record for the theft.

103.    Officer Price filed a claim for unemployment compensation benefits.

104.    Frazer falsely claimed Officer Price had been fired for cause, and as a result, Officer Price's claim for unemployment benefits was initially denied by the Commonwealth.

105.    Officer Price appealed the denial of her unemployment compensation benefits and an evidentiary hearing was conducted before an unemployment compensation referee on July 3, 2018.

106.    At the unemployment hearing ("UC Hearing"), Chief Kuhns and Officer Price testified under oath.

107.    The unemployment compensation referee's decision ("The Decision") concluded that Officer Price did not engage in any willful misconduct, and therefore was terminated, "without cause."

19

108.    The Decision found that Officer Price's testimony was credible and that she did not fail to obey a direct order to be present at J.C. Penney at any specific time on May 22, 2018.

109.    The Decision found Chief Kuhns' sworn testimony that he had ordered Officer Price to be in J.C. Penney between 5:00 and 6:00 p.m. on May 22, 2018 was not credible.

110.    Frazer appealed this adverse decision to the Unemployment Compensation Board of Review ("UCBR"), which affirmed the referee's findings of fact and conclusion of law.

111.    The UCBR decision identified contradictions and inconsistencies in Chief Kuhns' testimony and resolved all conflicts in the testimony in favor of Officer Price.

112.    On October 8, 2018, Officer Price filed EEOC Charge No. 533-2020-00118 and cross filed a Complaint with the Pennsylvania Human Relations Commission (PHRC) against Frazer Township.

113.    During the EEOC investigation, Frazer made several statements of fact which contradicted or were inconsistent with Chief Kuhns' sworn testimony at the UC hearing.

114.    Frazer reported to the EEOC that Chief Kuhns' order was for the officers to be visible at J.C. Penney from 5:00 to 6:30 p.m.; Chief Kuhns's UC hearing testimony was that his order was that they be there from 5:00 to 6:00 p.m.

115.    Frazer represented to the EEOC that when Chief Kuhns received the call from the J.C. Penney manager, he asked whether any officers were present, and the manager replied that no officers had been to the store.

116.    Chief Kuhns' testimony under oath at the UC hearing was unequivocal that he had not asked the store manager whether either officer was present.

117.    Frazer represented to the EEOC that Chief Kuhns claimed he had spoken to the A.P. Manager at Walmart and that he had confirmed that Walmart had not called the police for assistance between 5:00 and 6:00 p.m. on May 22, 2018; Chief Kuhns testified under oath that Officer Price had put in two incomplete written reports for incidents at Wal-Mart on May 22, 2018, and noted they would be completed on May 23, 2018, and Chief Kuhns further admitted, "I don't dispute she was at Wal-Mart. I know she was at Wal-Mart."

118.    At the UC hearing, Chief Kuhns first testified he had fired Officer Nablo. Chief Kuhns later admitted he had not fired Officer Nablo, but that he allowed Officer Nablo to resign.

119.    Frazer reported to the EEOC that Officer Miller had received only a verbal warning for supposedly failing to follow the Chief's order on May 22, 2018; at the UC hearing, Chief Kuhns swore under oath that he had given Officer Miller a written reprimand and a last chance final written warning.

120.    Following the EEOC's investigation, on April 1, 2022, the EEOC issued a Letter of Determination (LOD) which concluded, in pertinent part:

> Charging Party has established a prima facie case of discrimination because of her sex (female) in that she was discharged for alleged insubordination while male employees who engaged in similar or more egregious misconduct were not discharged. Based on the evidence gathered, Respondent's articulated non-discriminatory reason for the discharge is not worthy of belief and is therefore a pretext for sex discrimination....I find there is reasonable cause to believe that Charging Party was discharged and subjected to unequal terms and conditions of employment because of her sex (female) in violation of Title VII.

121.    As the direct, proximate and foreseeable result of Frazer's unlawful acts, Plaintiff has suffered and will continue to suffer out of pocket expenses, the loss of valuable wages and benefits and future employment opportunities; she has also suffered emotional distress, embarrassment, harm to her reputation, and humiliation.

122.    The U.S. Department of Justice reviewed the EEOC's Letter of Determination and issued a Notice of Right to Sue dated February 6, 2023.

123.    This suit is filed within ninety days of Plaintiff's receipt of the Notice of Right to Sue.

124.    All administrative prerequisites to filing suit have been satisfied or have occurred.

<u>V. COUNTS</u>

22

## Count 1: Title VII Sex Discrimination

125.    Paragraphs 1-124 are incorporated herein as if set forth in their entirety.

126.    Frazer discriminated against Officer Price in her terms, conditions, rights and privileges of employment because of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended.

## Count 2: Pennsylvania Human Relations Act (PHRA) Sex Discrimination

127.    Paragraphs 1-126 are incorporated herein as if set forth in their entirety.

128.    Frazer discriminated against Officer Price in her terms, conditions, rights and privileges of employment because of her sex in violation of the Pennsylvania Human Relations Act, as amended.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for:

a.      Full back pay and benefits;

b.      Reimbursement of her out of pocket expenses she has incurred and will continue to incur as the result of Frazer's unlawful acts;

c.      Pre- and post-judgment interest;

d.      Compensatory damages;

e.      Reasonable attorney fees and costs of suit;

f.      An additional payment in an amount necessary to offset the adverse tax consequences of receiving the damages award in a lump sum, in order to effectuate the remedial purposes of the statutes, and,

g.      All other legal and equitable relief as the Court finds just and proper.

**A jury trial is demanded as to all matters triable to a jury.**

Filed: May 5, 2023          Respectfully submitted,
s/Christian Bagin
Christian Bagin
PA ID # 85511
WIENAND & BAGIN
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
PH: 412-281-1110
FAX: 412-281-8481
Christian@wienandandbagin.com